UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SKOKOMISH INDIAN TRIBE, | CASE NO. C13-5071JLR |
| Plaintiff, | ORDER GRANTING MOTIONS TO DISMISS |
| v. | |
| PETER GOLDMARK, et al., | |
| Defendants. | |

## I.       INTRODUCTION

Before the court are (1) Defendants Peter Goldmark, Washington State

Commissioner of Public Lands and Administrator for the Department of Natural

Resources ("DNR"); Lenny Young, Supervisor for DNR; Bob Ferguson, Attorney

General for the State of Washington; Phil Anderson, Director of the Washington

Department of Fish and Wildlife ("WDFW"); and Bruce Bjork, Assistant Director of

WDFW and Chief of WDFW Enforcement's (collectively "State Defendants") motion for

dismissal of Plaintiff Skokomish Indian Tribe's ("the Tribe") action (State Mot. (Dkt.

# 59)); and (2) Defendants Prosecuting Attorneys Michael Dorcy of Mason County, Russell Hauge of Kitsap County, Scott Rosekrans of Jefferson County, H. Steward Menefee of Gray's Harbor County, Deborah Kelly of Clallam County, and Jon Tunheim of Thurston County's  (collectively "Defendant County Prosecutors") motion for dismissal (Pros. Mot. (Dkt. # 60)).  The court has considered the motions, all submissions filed in support of or opposition thereto including the memorandum of the *amici curiae* Hoh Tribe and Quileute Tribe (A.C. Mem. (Dkt. # 67), the balance of the record, and the applicable law.  In addition, the court heard oral argument from counsel on January 2, 2014.  Being fully advised, the court GRANTS both motions on grounds that Skokomish Indian Tribe failed to join certain other Indian tribes in this action.  These other tribes are required parties under Federal Rule of Civil Procedure 19, but cannot be joined due to their sovereign immunity.  Because the court concludes that the action cannot proceed "in equity and good conscience" without these other tribes, *see id.*, the court dismisses Skokomish Indian Tribe's action without prejudice.  With respect to Defendants Goldmark and Young only, the court also grants Defendants' motions to dismiss on grounds of Eleventh Amendment sovereign immunity and because Skokomish Indian Tribe has failed to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Nevertheless, despite granting Defendants' motions, the court also grants Skokomish Indian Tribe leave to amend its Amended Complaint.

## II.     BACKGROUND

In this action, Skokomish Indian Tribe seeks "to protect the privilege of hunting and gathering roots and berries on open and unclaimed lands, guaranteed by Article 4 of

the Treaty of Point No Point of January 26, 1855." (Am. Compl. ¶ 2 (citing 12 Stat. 933).)  The Tribe's Amended Complaint, including 13 exhibits, is more than two hundred pages long.  (*See generally id.*)  The court, however, will endeavor to summarize the salient allegations and background that are pertinent to Defendants' motions.

From 1854-1856, Issac I. Stevens, Governor of Washington Territory, and his agents, executed several treaties with Native American tribes in areas that would eventually become part of the State of Washington.[1]  *See Washington v. Washington State Comm. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 661-62, 666 n.2 (1979); *United States v. Washington*, 384 F. Supp. 312, 330 (W.D. Wash. 1974).  These treaties are commonly referred to as the "Stevens Treaties."  *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 523 n.3 (9th Cir. 2005) (Berzon, J., dissenting).  By signing the "Stevens Treaties," the tribes reserved the right to continue their traditional activities, such as hunting and fishing.  *United States v. Winans*, 198 U.S. 371, 381 (1905); *see also Washington*, 443 U.S. at 667-68.

One of the Stevens Treaties is the Treaty of Point No Point ("the Treaty"), which is at issue in this lawsuit.  *Skokomish Indian Tribe*, 410 F.3d at 523 n.3 (Berzon, J., dissenting).  In addition to Skokomish Indian Tribe, three other Native American tribes have established that they signed or are successors to signatories of the Treaty of Point

---

[1] *See, e.g.*, Treaty of Olympia, 12 Stat. 971; Treaty of Point No Point, 12 Stat. 933; Treaty of Medicine Creek, 10 Stat. 1132; Treaty of Point Elliot, 12 Stat. 927; Treaty of Neah Bay, 12 Stat. 939; Treaty with the Yakimas, 12 Stat. 951; Treaty with the Walla Walla, Cayuse, Etc., 12 Stat. 945; Treaty with the Nez Perces, 12 Stat. 957.

No Point:  Jamestown S'Klallam,[2] Lower Elwha Tribal Community,[3] and Port Gamble

S'Klallam.[4]  In Article 1 of the Treaty, the signatory tribes ceded to the United States

certain lands which they had traditionally used.  *See* 12 Stat. 933, Art. 1.  The tribes,

however, reserved the right to continue their traditional hunting, gathering, and fishing

practices on ceded and certain other lands.  Specifically, Article 4 of the treaty states in

pertinent part that "[t]he right of taking fish at usual and accustomed grounds and stations

is further secured to said Indians, in common with all citizens of the United States . . .

together with the privilege of hunting and gathering roots and berries on open and

unclaimed lands. . . ."  12 Stat. 933, Art. 4.

Skokomish Indian Tribe alleges that the Tribe's territory as it relates to the

privilege of hunting and gathering in Article 4 of the Treaty includes:  (1) all lands ceded

within the boundaries established in Article 1 of the Treaty, (2) all lands within the

Tribe's territories, and (3) all lands within the Tribe's traditional use areas.  (Am. Compl.

¶ 103.)  In addition, the Tribe asserts that the hunting and gathering privilege of Article 4

extends to "[a]ll other lands not within the ceded area boundaries established in Article

1 . . . upon which the Privilege of hunting and gathering roots and berries is guaranteed

by the Article 4 . . . ."  (*Id.*)  It is unclear what land this last allegation encompasses

---

[2] *See United States v. Washington*, 626 F. Supp. 1405, 1432 (W.D. Wash. 1985).

[3] *United States v. Washington*, 459 F. Supp. 1020, 1039-41 (W.D. Wash. 1978).

[4] *United States v. Washington*, 459 F. Supp. 1020, 1039-41 (W.D. Wash. 1978).

specifically, but it appears that it may encompass something more than ceded areas, tribal territories, and traditional use areas.

Skokomish Indian Tribe further alleges that it has the "exclusive authority to determine the time, place and manner" of hunting and gathering as guaranteed by Article 4 of the Treaty. (Am. Compl. ¶¶ 94, 96.) The Tribe also alleges that it "may hunt and gather up to and including one hundred percent (100 %) of any game, roots and berries." (*Id.* ¶ 100.) The Tribe alleges that "no other Indian tribe nor the Defendants have standing to challenge . . . Skokomish Indian Tribe's interpretation [of the Treaty]." (*Id.* ¶ 88.)

Although the fishing provisions of the Stevens Treaties have been determined to reserve to "treaty right fishermen" the right to harvest up to fifty percent (50 %) of the harvestable fish that pass through its traditional fishing grounds, *see Washington*, 384 F. Supp. at 343, with limited exceptions,[5] the scope of the hunting and gathering provision has not been previously litigated in federal court. The Washington Supreme Court, however, has held that the Treaty of Point Elliot, one of the Stevens Treaties, reserved to the Nooksack Tribe the right to hunt within the lands ceded to the United States, as well

---

[5] Federal courts have ruled on two narrow aspects of the hunting and gathering provision generally contained within the Stevens Treaties, but the issues previously resolved are not pertinent here. In *United States v. Hicks*, 587 F. Supp. 1162, 1163 (W.D. Wash. 1984), the Western Washington District Court determined that Olympic National Park was not included within the Treaty of Olympia hunting right. In *Holcomb v. Confederated Tribes of Umatilla Indian Reservation*, 382 F.2d 1013, 1014 (9th Cir. 1967), the Ninth Circuit affirmed the District Court of Oregon's rulings that the Confederated Tribes of Umatilla's treaty rights to hunt were not diminished by the subsequent admission of Oregon State into the union, and that the Tribes have a right under the treaty to hunt for subsistence purposes on unclaimed lands without restriction or control under game laws and regulations of Oregon State.

as on any other lands that the Tribe could prove were "actually used for hunting and occupied by the Nooksack Tribe over an extended period of time." *State v. Buchanan*, 978 P.2d 1070, 1080-81 (Wash. 1999). Skokomish Indian Tribe alleges that "[t]his ruling is inaccurate, incomplete and in direct conflict with . . . Skokomish Indian Tribe's interpretation of [the] Privilege guaranteed by Article 4 of the Treaty of Point No Point . . . ." (Am. Compl. ¶ 105; *see also id.* ¶ 111 ("Skokomish Indian Tribe's interpretation of the Privilege is in direct conflict with the Washington State Supreme Court's ruling that limited access to publicly-owned lands." (citing *Buchanan*, 978 P.2d at 1081-82)).)

WDFW has depicted various ceded areas under the Stevens Treaties in a map, which is attached as an exhibit to the Tribe's Amended Complaint. (Am. Compl. Ex. F (Dkt. # 50-6).) According to this map, a total of eight tribes exercise hunting rights within the Treaty of Point No Point ceded areas. (*See id.*) First, the four co-signatories of the Treaty—Skokomish Indian Tribe, Jamestown S'Klallam, Lower Elwha Klallam, and the Port Gamble S'Klallam—all exercise treaty hunting rights within the Treaty of Point No Point ceded areas. (*See id.*) Second, the signatories to the Treaty of Medicine Creek—the Nisqually, Puyallup, Squaxin Island, and Muckleshoot Tribes—hunt in a large portion of the Treaty of Point No Point ceded areas that overlaps with the Treaty of Medicine Creek ceded areas as also depicted on the map. (*See id.*) Skokomish Indian Tribe has alleged that "[t]his map is inaccurate, incomplete, and in direct conflict with . . . Skokomish Indian Tribe's interpretation of the Privilege guaranteed by Article 4 of the Treaty of Point No Point . . . ." (Am. Compl. ¶ 107.)

In addition, Skokomish Indian Tribe asserts that Defendants' interpretation of the Tribe's treaty rights as disallowing hunting and gathering in the Wynoochee, Sol Duc, Dickey, and Quinault Ridge Game Management Units ("GMU") is also inaccurate and in conflict with Skokomish Indian Tribe's interpretation of Article 4. (*See id.* ¶¶ 112-15, Exs. G, H, I.) As depicted in the WDFW map, three of these GMUs (Dickey, Sol Duc, and Quinault Ridge) include portions of the ceded areas of the Amicus Curiae Hoh and Quileute Tribes and the Quinault Indian Nation. (*See id.* Ex. F.) Thus, there are at least eleven tribes with established, legally recognized rights to hunt and gather within the geographic areas placed at issue by Skokomish Indian Tribe's Amended Complaint.

Skokomish Indian Tribe alleges that Defendants' interpretation of Article 4 of the Treaty of Point No Point is at odds with the Tribe's interpretation. (*See, e.g.*, Am. Compl. ¶¶ 94, 96, 100, 107, 111.) Skokomish Indian Tribe alleges that, in light of this conflict, Defendants have "conspired . . . to unlawfully and illegally attempt to diminish and/or abrogate the Privilege guaranteed by Article 4" through the use of Defendant County Prosecutors. (*Id.* ¶ 127.) Indeed, a letter dated September 2, 2005, from the WDFW to David Herrera of the Skokomish Indian Tribe (which is attached as an exhibit to the Amended Complaint) reads:

> Thank you for sending the [WDFW] a copy of your 2005-2006 Skokomish Hunting and Trapping Regulations. . . .
>
> As part of reviewing the regulations it is important for the [WDFW] to renew our concern that these regulations open areas for hunting that we believe are outside the ceded areas of the Treaty of Point No Point and for which we have no evidence of traditional use by the Skokomish Tribe (Tribe). As a result, we do not think it is appropriate for the Tribe to open all or portions of the following GMUs: Wynoochee, Sol Duc, Dickey, and

1  Quinault Ridge.  As we have expressed to the tribes in the past, if the
   Department's enforcement officers encounter tribal hunters in areas outside
2  their ceded areas or in an area where traditional use by that tribe has not
   been established, evidence will be gathered and filed with the appropriate
3  county prosecutor."

4  (*Id.* Ex. G.)

5       In a subsequent email dated July 18, 2008 (which is also attached as an exhibit to

6  the Amended Complaint), an official with the WDFW reiterated a nearly identical threat

7  of prosecution:

8       As we have discussed on the phone, we are concerned that the tribe has
        opened areas to hunting outside of the ceded area and for which we have
9       not received any evidence from the tribe that demonstrates traditional use in
        those areas. . . . [A]s we stated at previous meetings, and in previous
10      correspondence, that if enforcement officers encounter tribal hunters
        outside their ceded area or in an area where traditional use by that tribe has
11      not been established, evidence will be gathered and filed with the
        appropriate county prosecutor.  The WDFW is willing to work with tribes
12      on formally establishing areas that were traditionally used that are outside
        of a ceded area.  Other entities besides the WDFW and the Tribe that would
13      need to be part of those discussions include affected county prosecutor(s),
        other tribes that may have overlapping ceded and/or traditional sue areas in
14      the area that is being proposed.

15  (*Id.* Ex. H.)

16      More recently, in a July 23, 2012, letter to officials of the Point No Point

17  Treaty Council, and copied to an official of the Skokomish Indian Tribe,

18  Defendant Phil Anderson, Director of WDFW, threatened enforcement against

19  Treaty hunters with respect to the exercise of their alleged Treaty rights outside of

20  the WDFW's understanding of the Tribe's ceded and traditional use area, as well

21  as of the exercise of alleged Treaty rights on private industrial timberlands, as

22  follows:

The Game Management Units (GMUs) opened for hunting by [Point No Point] Tribes include areas beyond the geographic scopes of the [Point No Point] Ceded Area (e.g., Hoko, Quinault Ridge, and Wynoochee), as interpreted by WDFW. . . . Tribal hunting outside of Ceded Area, from our perspective, is contingent upon our understanding of the Tribe having used and occupied those traditional areas over an extended period of time prior to or during the time their respective Treaties were signed. . . .

*****

Under the Treaty . . . , the Tribes reserved the right to hunt on "open and unclaimed lands" within the Treaty Area. Private land, even with the permission of the landowner, is not "open and unclaimed." While WDFW has expressed its willingness to enter into agreements with Tribes relative to Tribal hunting activities on private industrial timberlands, which is a subset of private lands defined by specific criteria, we do not have any agreements relative to Tribal hunting activities on other types of private land.

While Tribal regulations may allow hunting on private industrial timberlands, from our point of view, this activity is contingent on an agreement with WDFW, permission from the landowner, and acceptance by the County Prosecutor of the terms of the agreement. Absent all three of these items, WDFW enforcement officers would apply state law to Treaty hunters hunting on private industrial timberlands.

(Am. Compl. Ex. I.)

In addition, Skokomish Indian Tribe also alleges that counsel for Defendant County Prosecutor Russell Hauge wrote in a May 31, 2013, email that "[o]nly the county commissioners can agree to any 'gathering' on county lands, and unless and until that happens county personnel will not treat Skokomish Tribal members any differently than normal." (Am. Compl. ¶ 119.) In addition, Skokomish Indian Tribe asserts that it received a copy of Chapter 10.12 of the Kitsap County Code, which provides that "[i]t is unlawful to remove, destroy, mutilate or deface any tree, shrub, flower or other plant," and that a violation of that provision is a misdemeanor. (*Id.*) Skokomish Indian Tribe asserts

that the forgoing interpretation of the Kitsap County Code is in direct conflict with the Tribe's interpretation of its rights under Article 4 of the Treaty of Point No Point. (*Id.*)

Skokomish Indian Tribe alleges "a partial list of members . . . who while exercising the Privilege [of hunting and gathering under Article 4 of the Treaty of Point No Point] were actually harmed or were subject to imminent or certainly impending harm by Defendants' voluntary enforcement of the disputed interpretation of the Privilege." (*Id.* ¶ 124.) The list includes the names of seven specific individuals, but also includes "[a]ll enrolled members of Plaintiff, Skokomish Indian Tribe." (*Id.*) The Tribe provides few details concerning how each of these specific individuals was "harmed," except for James G. Byrd and Delbert W. Miller, who the Tribe alleges were "falsely prosecuted and convicted" of hunting violations. (*See id.*)

As State Defendants point out, the two prosecutions identified by Skokomish Indian Tribe in the amended complaint are decades old. (*See id.*; *see also* State Mot. at 6-7.) State Defendants further note that Mr. Miller's conviction was ultimately overturned by the Washington Supreme Court in *State v. Miller*, 689 P.2d 81 (Wash. 1984). However, the Supreme Court's ruling reversing Mr. Miller's conviction was on grounds not at issue in the Amended Complaint.[6] Although Mr. Byrd's conviction was upheld on

---

[6] In *Miller*, petitioners were convicted of killing and possessing an elk out of season in the Olympic National Forest. 689 P.2d at 80. The Washington Supreme Court held that national forest land is "open and unclaimed" land within the meaning of the Treaty of Point No Point, and that treaty hunters have a right to hunt on such lands, unrestricted by State regulation, unless the regulation is both reasonable and necessary for conservation purposes, and the regulation's application to Native Americans covered by the treaty is necessary for conservation. *Id.* at 82 n.2, 86.

appeal, *see State v. Byrd*, 628 P.2d 504 (Wash. Ct. App. 1981), the ruling of the

Washington Court of Appeals in *Byrd* also was ultimately overruled by the Washington

Supreme Court in *Miller*, 689 P.2d at 86-87, but again on grounds not at issue in this suit.[7]

In any event, the Tribe alleges that it "intends to fully exercise the Privilege guaranteed by

Article 4 of the Treaty . . . consistent with . . . [the] Tribe's interpretation of th[e]

Privilege absent a federal adjudication to the contrary." (Am. Compl. ¶ 136.)

### III. ANALYSIS

Defendants have asserted several bases for dismissal. State Defendants move to

dismiss (1) under Federal Rule of Civil Procedure 12(b)(1) on grounds that the court

lacks subject matter jurisdiction because Skokomish Indian Tribe fails to demonstrate

Article III standing by alleging an injury in fact (State Mot. at 3-8), (2) under Federal

Rule of Civil Procedure 12(b)(6) on grounds that Skokomish Indian Tribe fails to state a

claim because their allegations lack facial plausibility (*id.* at 8-10), (3) under the

Eleventh Amendment on grounds that Skokomish Indian Tribes' claims are barred by

sovereign immunity (*id.* at 10-12), and (4) under Federal Rule of Civil Procedure 19 on

grounds that Skokomish Indian Tribe failed to join other indispensable parties, namely

other tribes, such as the other signatories to the Treaty of Point No Point, who would be

prejudicially affected by any ruling herein (*id.* at 13-22). Defendant County Prosecutors

also move for dismissal based on a lack of Article III standing (Pros. Mot. at 8-10) and

failure to state a claim under Rule 12(b)(6) (*id.* at 3-7). In addition, Defendant County

---

[7] *See supra* Note 6.

Prosecutors join in State Defendants' motion for dismissal based on Eleventh

Amendment sovereign immunity and failure to join indispensable parties. (*Id.* at 10-11.)

As discussed below, the court concludes that Skokomish Indian Tribe has alleged

an injury in fact sufficient to establish Article III standing and the court's subject matter

jurisdiction and that, with the exceptions of Defendants Goldmark and Young, the suit is

not barred by the Eleventh Amendment. The court must decide these issues before

deciding either the parties' Rule 12(b)(6) or Rule 19 motions. *Wilbur v. Locke*, 423 F.3d

1101, 1106-07 (9th Cir. 2005) (holding that issues of Article III standing and Eleventh

Amendment immunity to suit must be decided before reaching a Rule 19 issue),

*abrogated on other grounds*, *Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010) ; *see

also L.A. Cnty. Bar Assoc. v. Eu*, 979 F.2d 697, 700 (9th Cir. 1992) ("[S]tanding is a

threshold questions which we must resolve before proceeding to the merits.").

## A. Article III Standing

To establish standing under the "case or controversy" requirement of Article III of

the United States Constitution, a plaintiff must demonstrate a sufficient personal stake in

the outcome to justify the invocation of judicial process. *Eu*, 979 F.2d at 700 (citing

*Baker v. Carr*, 369 U.S. 186, 204 (1962)). "It is well established that 'the irreducible

constitutional minimum of standing contains three elements': (1) a concrete and

particularized injury that is 'actual or imminent, not conjectural or hypothetical'; (2) a

causal connection between the injury and the defendant's challenged conduct; and (3) a

likelihood that a favorable decision will redress that injury." *Pyramid Lake Paiute Tribe

of Indians v. Nevada, Dep't of Wildlife*, 724 F.3d 1181, 1187-88 (9th Cir. 2013) (quoting

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotation marks and citations omitted)).

The only element at issue here is the first—a cognizable injury. Defendants assert that Skokomish Indian Tribe has failed to allege an injury that is concrete and particularized. (*See* State Mot. at 3-8; State Reply (Dkt. # 74) at 2-5; Pros. Mot. at 7-10; Pros. Reply (Dkt. # 75) at 4-7.) Skokomish Indian Tribe, as the party invoking federal jurisdiction, bears the burden of establishing standing. *See Lujan*, 504 U.S. at 561. However, in ruling on a motion to dismiss for want of standing, the "court[] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1121 (9th Cir. 2010); *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). Thus, "[a]t the pleading stage," as in this case, "general factual allegations of injury resulting from the defendant's conduct may suffice . . . ." *Cardenas v. Anzai*, 311 F.3d 929, 933 (9th Cir. 2002) (quoting *Lujan*, 504 U.S. at 561); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 n.3 (1992) ("*Lujan*, since it involved the establishment of injury in fact at the summary judgment stage, required specific facts to be adduced by sworn testimony; had the same challenge to a generalized allegation of injury in fact been made at the pleading stage, it would have been unsuccessful."). The court cannot, however, interpret the complaint so liberally as to extend its jurisdiction beyond constitutional limits. *Western Mining Council*, 643 F.2d at 624. Further, because Skokomish Indian Tribe seeks injunctive relief, it must show "a very significant possibility of future harm." *Montana Shooting Sports Ass'n v. Holder*,

727 F.3d 975, 979 (9th Cir. 2013) (quoting *Nat'l Aububon Soc'y, Inc. v. Davis*, 307 F.3d 835, 855-56 (9th Cir. 2002), *opinion amended in other respects on denial of reh'g*, 312 F.3d 416 (9th Cir. 2002)).

The decision the court found addressing standing with facts most similar to the one at hand is from a federal district court that is outside of the Ninth Circuit. Applying the foregoing standards, the court in *Ottawa Tribe of Oklahoma v. Speck*, 447 F. Supp. 2d 835 (N.D. Ohio 2006), held that an Indian Tribe demonstrated injury-in-fact for purposes of Article III standing where the Tribe had informed the State's Director of Natural Resources that it intended to commence exercising its commercial hunting and fishing rights allegedly preserved under treaty and the same day the State's attorney general announced that he was rejecting the Tribe's claim for hunting and fishing rights. *Id.* at 838. Under the straightforward analysis of *Speck*, Skokomish Indian Tribe would demonstrate an injury in fact for purposed of establishing Article III standing by alleging, as it has, hunting and gathering Treaty rights that Washington State officials have expressly disclaimed. *Id.* Unfortunately, the court is not convinced that the analysis of Skokomish Indian Tribe's standing to pursue its present claims is as straightforward in the Ninth Circuit as it appears to be in the Northern District of Ohio. As discussed below, in the Ninth Circuit, Skokomish Indian Tribe's standing rests on its allegations that Defendants have threatened enforcement actions against the Tribe's members for exercising the Tribe's alleged Treaty rights at issue here.

Skokomish Indian Tribe has alleged that Defendants have threatened to enforce certain state regulations in contravention of its members' alleged rights to hunt and gather

under the Treaty of Point No Point.  (*See, e.g.*, Am. Compl. ¶¶ 119, 124, 127, Exs. G, H.)

The Ninth Circuit has held that, although "arrest is not necessarily a prerequisite for an

individual to challenge the applicability of a criminal statute," *Oklevueha Native Am.*

*Church of Haw., Inc. v. Holder*, 676 F.3d 829, 835 (9th Cir. 2012), "neither the mere

existence of a proscriptive statute nor a generalized threat of prosecution satisfies the

'case or controversy' requirement," *Thomas v. Anchorage Equal Rights Comm'n*, 220

F.3d 1134, 1139 (9th Cir. 2000) (en banc) (citing *San Diego Cnty. Gun Rights Comm'n v.*

*Reno*, 98 F.3d 1121, 1126-27 (9th Cir. 1996)).  Rather, the plaintiff "must show a *genuine*

threat of *imminent* prosecution," not the "mere possibility of criminal sanctions." *San*

*Diego Cnty. Gun Rights Comm'n*, 98  F.3d at 1126 (internal quotation marks omitted;

emphasis in original).

Thus, to determine whether Skokomish Indian Tribe has standing to pursue its

claims here, the court must consider whether the Tribe has alleged a genuine threat of

imminent prosecution.  "When evaluating whether a claimed threat of prosecution is

genuine," the court must "consider:  (1) whether the plaintiff has articulated a concrete

plan to violate the law in question; (2) whether the prosecuting authorities have

communicated a specific warning or threat to initiate proceedings; and (3) the history of

past prosecution or enforcement under the challenged statute." *Wolfson v. Brammer*, 616

F.3d 1054, 1058 (9th Cir. 2010).

With respect to the first consideration of whether the plaintiff has articulated a

concrete plan to violate the law or regulation in question, "[a] general intent to violate a

statute at some unknown date in the future does not rise to the level of an articulated,

concrete plan." *Thomas*, 220 F.3d at 1139. However, where a plaintiff alleges that he or she has actually engaged in the illegal behavior at issue, the first element is satisfied. *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 773 (9th Cir. 2006*); see also Jacobus v. Alaska*, 338 F.3d 1095, 1105 (9th Cir. 2003) (holding that a challenge to the validity of campaign finance laws was ripe because "[p]laintiffs have gone far beyond the requirement that they articulate a concrete plan to violate the law, and instead have actually engaged in the illegal behavior at issue.").

Here, Skokomish Indian Tribe has alleged that Defendants' enforcement of laws and regulations, in conflict with the Skokomish Indian Tribe's interpretation of the Privilege of hunting and gathering in Article 4 of the Treaty of Point No Point, has "resulted in the unlawful and illegal seizure of persons or property belonging to Plaintiff . . . and its members," and "the prosecution of members . . . for alleged criminal and civil violations."[8] (Am. Compl. ¶ 91.) In addition, Skokomish Indian Tribe has alleged at least two specific instances where tribal members have been prosecuted and convicted for hunting violations as a result of "Defendants' voluntary enforcement of the disputed interpretation of the Privilege." (*Id.* ¶ 124(a) & (b).) Defendants complain that these allegations concern decades-old prosecutions (State Mot. at 6-7), but Skokomish Indian Tribe also specifically identifies by name five other members, "who *while*

---

[8] The Tribe also has alleged that "Defendants' denial of access to these lands and resources guaranteed by the Treaty . . . includes . . . monetary damages, as well as damages related to the detrimental interference with . . . [the] Tribe's cultural and religious customs and practices." (*Id.* ¶ 91.)

*exercising the Privilege* [of hunting and gathering under Article 4 of the Treaty of Point

No Point] were actually harmed or were subject to imminent or certainly impending harm

by Defendants' voluntary enforcement of the disputed interpretation of the Privilege."

(*Id.* ¶ 124 (italics added).)

Finally, the Tribe has alleged that it has promulgated its own regulations opening

areas for hunting to its members that Defendants consider to be outside the area permitted

under the Treaty (*see id.* Exs. G, H), and that its members will "continue to hunt and

gather all native foodstuffs . . . and . . . resources unless specifically limited by [the]

Tribe's regulations" (*id.* ¶ 86). These allegations, in combination, and construed in favor

of Skokomish Indian Tribe, as the court is required to do, allege not only that Skokomish

Indian Tribe and its members plan to act in violation of the challenged regulations, but

that they have in fact violated the challenged regulations and plan to continue doing so

despite having suffered the consequences or threatened consequences of enforcement

actions by Defendants.

The court finds the Ninth Circuit's recent decision in *Oklevueha Native American

Church of Hawaii, Inc. v. Holder*, 676 F.3d 829 (9th Cir. 2012), to be instructive. In that

case, the district court dismissed a Native American church's complaint challenging

federal drug laws on the ground that the laws infringed on the church's use of cannabis.

The court reasoned that the complaint failed to allege "exactly how, where, in what

quantities Plaintiffs intended to consume marijuana, and d[id] not specify how they

intend[ed] to cultivate or acquire, store, and distribute marijuana." *Id.* at 835. The Ninth

Circuit reversed the district court, holding that Plaintiffs had sufficiently alleged a

concrete plan when they alleged that "they ha[d] used marijuana in violation of the [challenged law] countless times, and plan[ned] to continue to do so." *Id.* at 836. The Ninth Circuit "explained that the 'concrete plan' element of the genuine threat inquiry is satisfied where plaintiffs had more than a 'concrete plan' to violate the laws at issue because they actually did violate them on a number of occasions." *Id.* (some internal quotation marks omitted). Here, like the plaintiffs in *Oklevueha*, Skokomish Indian Tribe, as described above, has alleged that the Tribe and its members have actually violated the challenged regulations, that some have suffered the consequences or threatened consequences of enforcement actions, but that its members nevertheless plan to continue violating the regulations at issue. The court, therefore, holds that the allegations in the Tribe's Amended Complaint satisfy the "concrete plan" element of the genuine threat inquiry.

The second element the court must consider is whether prosecuting authorities have communicated a specific warning or threat to initiate proceedings. *Wolfson*, 616 F.3d at 1058. The Ninth Circuit has found a threat by a State official to refer a matter to a county attorney for enforcement to be sufficient for purposes of Article III standing analysis. *See Culinary Workers Union v. Del Papa*, 200 F.3d 614, 617-18 (9th Cir. 1999) (finding attorney general's threat "to refer prosecution to 'local criminal authorities'" sufficient for purposes of Article III standing).

The court has little difficulty concluding that statements from WDFW officials to representatives of Skokomish Indian Tribe concerning the disputed scope of land opened by the Tribe's hunting regulations constitute "specific warnings" or "threats" to initiate

proceedings against the Tribe's members. (*See* Am. Compl. Exs. G, H.) After reviewing

Skokomish Indian Tribe's hunting regulations, which were based on the Tribe's

interpretation of the Treaty of Point No Point, WDFW officials state (not once, but twice)

that if WDFW enforcement officers encounter tribal hunters in areas outside their ceded

areas or in an area where traditional use by that tribe has not been established, evidence

will be gathered and filed with the appropriate county prosecutor. (Am. Compl. Exs. G,

H.) In addition, Defendant Anderson threatens enforcement with respect to the Tribe's

assertion of Treaty hunting rights with respect to private industrial timberland. (*Id.* Ex.

I.) Construing the allegations in the Amended Complaint in favor of Skokomish Indian

Tribe, the court also considers the alleged May 31, 2013, email from counsel for Kitsap

County Prosecutor to a representative of the Tribe to be a "specific warning" or "threat"

to initiate proceedings against members of the Tribe found gathering on county lands in

violation of Chapter 10.12 of the Kitsap County Code. (Am. Compl. ¶ 119.) Thus, the

court holds that the allegations in the Amended Complaint satisfy the second element of

the genuine threat inquiry.

　　Even if the foregoing statements, however, did not constitute "specific warnings"

or "threats" to initiate proceedings, Skokomish Indian Tribe's allegations would still

satisfy the second element. Once again, the court finds the Ninth Circuit's decision in

*Oklevueha* to be instructive. In *Oklevueha*, federal agents seized $7,000.00 worth of

marijuana that was intended for the church's use. 676 F.3d at 834. No prosecution arose

out of the seizure. *Id.* The district court found that the plaintiffs had not adequately

alleged a specific threat of prosecution because the complaint lacked allegations of any

threat or warning from federal authorities or that the plaintiffs intended to continue to

bring in marijuana in a way likely to be noticed by federal drug authorities.  *Id.* at 836.

The Ninth Circuit held that the district court's focus on future prosecution was inapposite

where the statute had already been enforced against the plaintiffs.  *Id.*  The court found

that where the regulation had already been enforced against the plaintiffs, any concerns

that the plaintiffs' fear of enforcement is purely speculative are eliminated.  *Id.*  Here, of

course, Skokomish Indian Tribe has specifically alleged that Defendants' enforcement of

laws and regulations that conflict with the Tribe's interpretation of its hunting and

gathering rights under the Treaty have "resulted in the unlawful and illegal seizure of

persons or property belonging to Plaintiff . . .  and its members," and "the prosecution of

members . . . for alleged criminal and civil violations."  (Am. Compl. ¶ 91.)  Further, the

Tribe has specifically identified two prior prosecutions of its members for hunting

violations.  (Am. Compl. ¶ 124(a) & (b).)  Defendants complain that these prosecutions

took place in the 1980s.  (State Mot. at 6-7; Pros. Mot. at 6.)  Although the age of the

prosecutions certainly lessens their impact, the fact that members of Skokomish Indian

Tribe have endured prosecutions for asserting their hunting rights under the Treaty of

Point No Point in the past nevertheless serves to diminish concerns that the Tribe's fear

of enforcement is purely speculative under the genuine threat inquiry.

 Finally, the court similarly concludes that Skokomish Indian Tribe satisfies the

final prong of the genuine threat inquiry—the history of past prosecution or enforcement.

*Wolfson*, 616 F.3d at 1058.  Again, Defendants assert that the two specific prosecutions

identified in Skokomish Indian Tribe's Amended Complaint are stale.  (State Mot. at 6-7;

Pros. Mot. at 6.)  However, the fact that Skokomish Indian Tribe members have been prosecuted while exercising their Treaty hunting rights in the past supports their claim that the alleged threat of prosecution today is genuine, particularly when coupled with the explicit threat that if members are discovered exercising Treaty rights in disputed areas "evidence will be gathered and filed with the appropriate county prosecutor." (Am. Compl. Exs. G, H.)  In sum, the court concludes that Skokomish Indian Tribe has established standing by demonstrating a genuine threat of prosecution—at least in the context of Defendants' motion which is based on a facial challenge to the Amended Complaint.

### B. Eleventh Amendment Immunity

Skokomish Indian Tribe's Amended Complaint lists five State Defendants:  (1) Peter Goldmark, Commissioner of Public Lands and Administrator of DNR (Am. Compl. ¶¶ 14-16); (2) Lenny Young, Supervisor for DNR, charged with direct supervision of DNR's activities delegated by the Administrator (*id.* ¶ 17); (3) Bob Ferguson, Attorney General for Washington State (*id.* ¶ 18); (4) Phil Anderson, Director of WDFW (*id.* ¶ 20); and (5) Bruce Bjork, Assistant Director of WDFW and Chief of WDFW Enforcement (*id.* ¶ 21).  In addition, Skokomish Indian Tribe's Amended Complaint lists six county prosecutors as defendants.  (*Id.* ¶¶ 22-28.)

All Defendants have moved for dismissal based on Eleventh Amendment sovereign immunity and the inapplicability of the exception found in *Ex Parte Young*, 209 U.S. 123 (1908), for suits against state officers in their official capacity for prospective relief regarding enforcement of a challenged law.  (State Mot. at 11-12; Pros.

Mot. at 10.)  In order to properly exercise jurisdiction over Defendants based on *Ex Parte Young* there must be "some connection" between the named officer and enforcement of a challenged law.  *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).  The connection must be "fairly direct."  *Id.*  A generalized duty to enforce state law will not subject an official to suit.  *Id.*  Defendants assert that this necessary connection is lacking in the Tribe's Amended Complaint.  (*See* State Mot. at 5.)

There is little doubt that Defendant County Prosecutors fall within the *Ex Parte Young* exception to sovereign immunity here.  Skokomish Indian Tribe has attached documents to its Amended Complaint in which WDFW officials threaten that, if WDFW enforcement officers encounter Tribe members exercising their alleged Treaty rights in disputed areas, the enforcement officers will gather and file evidence with the appropriate county prosecutor.  (*See* Am. Compl. Exs. G, H.)  Further, Defendant County Prosecutors state that they "believe [they] were named based on their authority to enforce the state laws and regulations that the Tribe takes issue with." (Pros. Mot. at 10.)  This acknowledgement of their ability to enforce the laws and regulations at issue here, along with Skokomish Indian Tribes' allegations, satisfies the requirement that there be "some connection" that is "fairly direct" between the named official and enforcement of the challenged regulation.  *See Eu*, 979 F.2d at 704.

The court also concludes that there is a sufficient connection between enforcement of the challenged regulations here and both Mr. Anderson, as the Director of WDFW, and Mr. Bjork, as the Chief of WDFW Enforcement, to warrant an exception to sovereign immunity with respect to these two defendants under *Ex Parte Young*.  After all, Mr.

Anderson authored one of the threats of prosecution that Skokomish Indian Tribe appended to its Amended Complaint (Am. Compl. Ex. I), and another was copied to Mr. Anderson by the WDFW official who authored it (*id.* Ex. G). The threats at issue involved the collection of evidence by WDFW enforcement officers for referral to county prosecutors (*id.* Exs. G, H; *see also id.* Ex. I ("WDFW enforcement officers would apply state law to Treaty hunters hunting on private industrial timberlands")), and as Chief of WDFW Enforcement, the court concludes Mr. Bjork's connection to enforcement of the challenged regulations is sufficient as well.

Further, the court concludes that Skokomish Indian Tribe has also properly sued Attorney General Bob Ferguson under the *Ex Parte Young* exception to sovereign immunity. State attorney generals are not invariably proper defendants in challenges to state criminal laws. *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004). Where a state attorney general cannot direct, in a binding fashion, the prosecutorial activities of officers who actually enforce the law or bring his or her own prosecution, he or she may not be a proper defendant. *Id.* (citing *Long v. Van de Kamp*, 961 F.2d 151, 152 (9th Cir. 1992); *S. Pac. Transp. Co. v. Brown*, 651 F.2d 613, 614 (9th Cir. 1980)). However, in *Wasden*, the Ninth Circuit held that the attorney general of Idaho was a proper defendant under *Ex Parte Young* where he could, unless the county prosecutor objected, "*do every act* that the county attorney c[ould] perform." *Wasden*, 376 F.3d at 920 (italics in original). In other words, the Idaho attorney general could "in effect deputize himself (or be deputized by the governor) to stand in the role of a county

prosecutor, and in that role exercise the same power to enforce the statute the prosecutor would have."

In Washington, Attorney General Ferguson wields powers similar to those described for the Idaho attorney general above. Under RCW 34.10.232:

> (1) The attorney general shall have concurrent authority and power with the prosecuting attorneys to investigate crimes and initiate and conduct prosecutions upon the request of or with the concurrence of any of the following:
>
> (a) The county prosecuting attorney of the jurisdiction in which the offense has occurred;
>
> (b) The governor of the state of Washington; or
>
> (c) A majority of the committee charged with the oversight of the organized crime intelligence unit.

RCW 34.10.232(1). Thus, like Idaho's attorney general, Mr. Ferguson can deputize himself (subject to the concurrence of the governor or the other authorities listed in RCW 34.10.232(1)) to stand in the role of the county prosecutor and exercise the same power as the county prosecutors named herein. Based on *Wasden*, the court concludes that Mr. Ferguson is subject to suit here under the exception to sovereign immunity in *Ex Parte Young*.

The court, however, reaches the opposite conclusion with respect to Defendants Peter Goldmark and Lenny Young of Washington State's DNR. There are simply no allegations in the Amended Complaint connecting these Defendants or DNR to any threatened enforcement action against Skokomish Indian Tribe or its members. There are no specific allegations concerning Mr. Young at all, except for his identification as the

Supervisor of DNR.  (Am. Compl. ¶ 17.)  The only allegations concerning Mr. Goldmark describe his involvement, in his official capacity as Administrator of DNR, in executing an agreement with Skokomish Indian Tribe, to provide the Tribe with "Annual Passes" at no cost for display in vehicles operated on State managed land by enrolled members engaged in the exercise of off-reservation rights that have been preserved through Federal Treaty . . . ."  (Am. Compl. ¶ 118, Ex. I.)  The "Annual Pass" is described as "a tribal version of the Discover Pass," which is required be displayed on all vehicles operated in or parked on State managed land.  (*Id.* Ex. I.)  The Agreement recites that "[t]he State is making Annual Passes available for use by tribal members to avoid the inconvenience of citations based on failure to display a Discover Pass, when tribal members access state managed recreation lands in order to exercise reserved off-reservation rights."  (*Id.*)

Contrary to describing a connection between these Defendants and any threatened enforcement action, the meager allegations above describe actions to avoid unwarranted enforcement actions against members of Skokomish Indian Tribe while exercising their Treaty rights.  Accordingly, the court does not find the requisite connection between Defendants Goldmark and Young and the threat of any imminent enforcement action such that they may be properly sued under the exception to sovereign immunity found in *Ex Parte Young*.  The court GRANTS State Defendants' motion to dismiss the Tribe's claims against Mr. Young and Mr. Goldmark as barred by Eleventh Amendment sovereign immunity.

//

//

### C.  Federal Rule of Civil Procedure 12(b)(6)

Now that the court has addressed the threshold issues of Article III standing and Eleventh Amendment immunity, it turns to Defendants' motions to dismiss on other grounds.  Defendants assert that Skokomish Indian Tribe's Amended Complaint fails to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  (State Mot. at 8-10; Pro. Mot. at 3-7.)  In order to survive a motion to dismiss under Rule 12(b)(6), a plaintiff must "plead a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This statement must be sufficient to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Conley v. Gibson*, 355 U.S. 41, 47 (1957).  Under the pleading standards set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp v. Twombly*, 550 U.S. 544 (2007), it is not enough that a claim to relief be merely "possible" or "conceivable;" instead, it must be "plausible on its face."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  This standard is "not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  To cross the threshold from conceivable to plausible, a complaint must contain a sufficient quantum of "factual matter" alleged with a sufficient level of specificity to raise entitlement to relief above the speculative level.  *Twombly*, 550 U.S. at 555.

For the same reasons discussed above with respect to Eleventh Amendment sovereign immunity, the court GRANTS Defendants' motions to dismiss Skokomish Indian Tribe's claims against Defendants Goldmark and Young of Washington State's DNR under Rule 12(b)(6). The Amended Complaint contains insufficient allegations drawing any connection between Defendants Goldmark and Young, on the one hand, and a threat of imminent enforcement action against Skokomish Indian Tribe or its members, on the other. Consequently, the Tribe's allegations against these two Defendants do not rise to the level of plausibility required under *Iqbal* and *Twombly*. The court, therefore, GRANTS Defendants' motions to dismiss under Rule 12(b)(6) with respect to Defendants Goldmark and Young, but denies Defendants' Rule 12(b)(6) motion in all other respects.[9]

---

[9] The court recognizes that there is some authority indicating that Eleventh Amendment immunity goes to the court's subject matter jurisdiction which, if true, would bar the court's consideration of Defendants' Rule 12(b)(6) motion to dismiss with respect to Defendants Goldmark and Young. *See Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1172 (9th Cir. 2013) (ruling that after district court granted a motion to dismiss for lack of subject matter jurisdiction, it could not go on to grant defendant's motion for summary judgment to provide an alternative basis for decision in favor of defendant because the court did not have any power to reach the merits). For example, the Supreme Court has stated that "the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court." *Edelman v. Jordan*, 415 U.S. 651, 678 (1974); *but see Wis. Dep't of Corr. v. Schact*, 524 U.S. 381, 392 (1998) (noting that, as of 1998, the Supreme Court had not yet decided whether Eleventh Amendment immunity is a matter of subject matter jurisdiction). More recently, the Supreme Court noted that "[s]overeign immunity principles enforce an important constitutional limitation on the power of the federal courts," but the Court also noted in the same paragraph that a state "may choose to waive its immunity in federal court at its pleasure," *Sossamon v. Texas*, --- U.S. ----, 131 S.Ct. 1651, 1658-59 (2013). Although the first statement appears consistent with the idea that Eleventh Amendment sovereign immunity goes to the court's subject matter jurisdiction, the latter statement seems inconsistent with the notion that "[s]ubject matter jurisdiction can never be waived or forfeited." *See Gonzalez v. Thaler*, --- U.S. ----, 132 S.Ct. 641, 648 (2012). The Ninth Circuit has tried to reconcile the equivocal nature of Eleventh

### D. Federal Rule of Civil Procedure 19

State Defendants assert that Skokomish Indian Tribe's Amended Complaint must be dismissed under Federal Rule of Civil Procedure 19 for failure to join indispensable or "required" parties.[10] Fed. R. Civ. P. 19. Specifically, Defendants assert that Skokomish Indian Tribe's claims for allocation and a determination of the territory and resources encompassed by the privilege of hunting and gathering reserved in Article 4 of the Treaty of Point No Point must be dismissed because the other signatory Tribes to the Treaty, including Jamestown S'Klallam, Lower Elwha Tribal Community, and Port Gamble S'Klallam, are required or indispensable parties under Rule 19 that cannot be joined in

---

Amendment sovereign immunity by calling it "quasi-jurisdictional." *In re Bliemeister*, 296 F.3d 858, 861 (9th Cir. 2002) (citing *Hill v. Blind Indus. & Servs.*, 179 F.3d 754, 760 (9th Cir. 1999), *amended by* 201 F.3d 1186 (9th Cir. 2000)); *but see Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*, 343 F.3d 1036, 1040-44 (9th Cir. 2003) (continuing to characterize Eleventh Amendment immunity as going to the court's subject matter jurisdiction). Recent Ninth Circuit cases have also ruled that dismissal based on Eleventh Amendment immunity should be analyzed under Rule 12(b)(6) and not as a jurisdictional issue under Rule 12(b)(1). *See Elwood v. Drescher*, 456 F.3d 943, 949 (9th Cir. 2006) (stating that "dismissal based on Eleventh Amendment immunity is not a dismissal for lack of subject matter jurisdiction, but instead rests on an affirmative defense.") (quotations marks and citation omitted); *Tritchler v. Cnty. of Lake*, 358 F.3d 1150, 1153-54 (9th Cir. 2004) (stating that "Eleventh Amendment immunity does not implicate a federal court's subject matter jurisdiction in any ordinary sense and . . . it should be treated as an affirmative defense.") (internal quotation marks omitted); *Miles v. Cal.*, 320 F.3d 986, 988-89 (9th Cir. 2003) (ruling that "dismissal based on Eleventh Amendment immunity is not a dismissal for lack of subject matter jurisdiction") (citing *Hill v. Blind Indus. and Serv. of Md.*, 179 F.3d 754, 762 (9th Cir. 1999) (concluding that the Eleventh Amendment is not a jurisdictional bar because it is a defense that can be waived by the state)). Although Supreme Court and Ninth Circuit authority on the jurisdictional nature of Eleventh Amendment sovereign immunity lacks crystal clarity, this court concludes that a dismissal based on Eleventh Amendment immunity does not bar the court from considering Defendants' motion to dismiss based on Rule 12(b)(6).

[10] Following amendments in 2007, Rule 19 no longer refers to "indispensable" parties, but rather "required" parties. The change in terminology is not substantive but merely stylistic. *See Alto v. Black*, --- F.3d ----, 2013 WL 6813816, at *16 n.6 (9th Cir. 2013).

the absence of a waiver of their sovereign immunity. (State Mot. at 13.) State

Defendants further assert that any judgment in the absence of these other Tribes would

impair or impede the absent Tribes' ability to assert their Treaty rights and potentially

subject State Defendants to inconsistent obligations. (*Id.*) Prosecuting Attorney

Defendants join in this motion. (Pros. Mot. at 2, 11.) The court agrees with Defendants

and concludes that "in equity and good conscience" the Tribe's action should be

dismissed. Fed. R. Civ. P. 19(b).

Application of Rule 19 determines whether a party is indispensable.[11]

*Dawavendewa v. Salt River Project Agric. Improvement and Power Dist.*, 276 F.3d 1150,

1154 (9th Cir. 2002). The court must determine: (1) whether an absent party is required

to be joined in the action; and then, (2) if the party is required, but cannot be joined,

whether, in "equity and good conscience," the suit should be dismissed. *Alto v. Black*, ---

F.3d ----, 2013 WL 6813816, at *11 (9th Cir. 2013); *see also Dawavendewa*, 276 F.3d at

1155 (citing *Confederated Tribes v. Lujan*, 928 F.2d 1496, 1498 (9th Cir. 1991); *Makah*

---

[11] Pursuant to Rule 19:

> A person who is subject to service of process and whose joinder will not deprive
> the court of subject-matter jurisdiction must be joined as a party if: (A) in that
> person's absence, the court cannot accord complete relief among existing parties;
> or (B) that person claims an interest relating to the subject of the action and is so
> situated that disposing of the action in the person's absence may: (i) as a practical
> matter impair or impede the person's ability to protect the interest; or (ii) leave an
> existing party subject to a substantial risk of incurring double, multiple, or
> otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). "If a person who is required to be joined if feasible cannot be joined,
the court must determine whether, in equity and good conscience, the action should proceed
among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).

1   *Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990)). "The inquiry is a practical,

2   fact-specific one, designed to avoid the harsh results of rigid application."

3   *Dawavendewa*, 276 F.3d at 1154-55 (citing *Makah Indian Tribe*, 910 F.2d at 558);

4   *Confederated Tribes*, 928 F.2d at 1498 ("There is no precise formula for determining

5   whether a particular non-party is necessary to an action. The determination is heavily

6   influenced by the facts and circumstances of each case.") (internal citations and

7   quotations omitted).

8          In determining whether a party is required under Rule 19, the court must examine

9   whether it can "award complete relief to the parties present without joining the non-

10  party." *Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony, Cal. v. City

11  of Los Angeles*, 637 F.3d 993, 997 (9th Cir. 2011) (internal quotations and citations

12  omitted). Alternatively, the court  considers "whether the [non-party] claims a legally

13  protected interest in the subject of the suit such that a decision in its absence will (1)

14  impair or impede its ability to protect that interest; or (2) expose [the existing parties] to

15  the risk of multiple or inconsistent obligations by reason of that interest." *Dawavendewa*,

16  276 F.3d at 1155 (citing *Makah Indian Tribe*, 910 F.2d at 558); *see also Alto*, 2013 WL

17  6813816, at *11 ("Joinder of the [Tribe] is 'required' if either:  (1) the court cannot

18  accord 'complete relief among existing parties' in the [Tribe's] absence, or (2)

19  proceeding with the suit in its absence will 'impair or impede' the [Tribe's] ability to

20  protect a claimed legal interest relating to the subject of the action, or 'leave an existing

21  party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent

22  obligations because of the interest.'") (quoting Fed. R. Civ. P. 19(a)(1)(A)-(B)).  Given

1  this formulation, the court has little difficulty concluding that the absent Tribes, who are

2  also signatories to the Treaty of Point No Point, are necessary parties to this litigation.

3  As discussed above, because the hunting and gathering provisions of the Treaty of

4  Point No Point have been only tangentially litigated in federal court (*see supra* § II., n.5),

5  all tribes with hunting and gathering rights in the subject territory have a vital, legally-

6  protected interest in how the Treaty is interpreted and enforced.  *See, e.g.*, *Makah Indian*

7  *Tribe*, 910 F.2d at 559 (concluding that tribes who shared treaty fishing rights to salmon

8  had an interest in the Makah Tribe's claim seeking reallocation of the treaty salmon

9  harvest); *Keweenaw Bay Indian Cmty. v. State*, 11 F.3d 1341, 1346-47 (6th Cir. 1993)

10  (absent tribes claiming treaty rights to fish are necessary parties in other tribe's suit

11  against state to protect fish); *N. Arapaho Tribe v. Harnsberger*, 697 F.3d 1272, 1279

12  (10th Cir. 2012) (tribe's request for determination of status of land shared with absent

13  tribe impaired absent tribe's legally protected interest).

14  The judgment that Skokomish Indian Tribe seeks in this case would cause

15  considerable prejudice to the interests of other signatory tribes of the Treaty of Point No

16  Point.  First, Skokomish Indian Tribe seeks a declaration of "the scope of the Privilege of

17  hunting and gathering on open and unclaimed lands" and "the allocation of game, roots,

18  and berries to [the Tribe] as guaranteed by Article 4 of the Treaty of Point No Point . . . ."

19  (Am. Compl. ¶ 145(a)(viii), (xi).)  A determination of the scope and extent of the hunting

20  and gathering privilege would necessarily involve a determination of what lands and

21  resources are available to all four signatory tribes, not just Skokomish Indian Tribe, under

22  the Treaty of Point No Point.  *See N. Arapaho Trib*e, 697 F.3d at 1281-82 (finding second

tribe would suffer prejudice where "two distinct tribes possess an equal and undivided interest in the same land, and the treaty right at issue implicates the very status of the land. The [first tribe's] treaty rights vis-à-vis the State of Wyoming are inseparable from the [second tribe's] treaty rights"). Further, as the Ninth Circuit points out in *Makah Indian Tribe*, claims for allocation of a limited resource do not present a situation in which multiple parties share compatible interests, but rather are more analogous to a request by a beneficiary to allocate a common fund. *Makah Indian Tribe*, 910 F.2d at 558 (citing *Wichita and Affiliated Tribes of Okl. v. Hodel*, 788 F.2d 765, 774 (D.C. Cir. 1986)). Thus, with respect to the allocation of fish pursuant to the Treaty of Neah Bay, which is another Stevens Treaty, the Ninth Circuit concluded that granting relief to the plaintiff tribe would necessarily violate the treaty rights of absent signatory tribes because "any share that goes to the [plaintiff tribe] must come from [the] other tribes." *Id.* at 559. Such circumstances "present a textbook example . . . where one party may be severely prejudiced by a decision in his absence." *Wichita*, 788 F.2d at 775. The same is true here with respect to the Tribes' request for a determination of both the scope of hunting and gathering rights and the allocation of limited resources, such as game, roots, and berries, guaranteed under Article 4 of the Treaty of Point No Point.

Second, Skokomish Indian Tribe seeks a declaration that it has exclusive regulatory and management authority of hunting and gathering rights contained in the Treaty of Point No Point. Specifically, Skokomish Indian Tribe asserts that (1) it has "exclusive regulatory and management authority" of hunting and gathering roots and berries on open and unclaimed lands under Article 4 of the Treaty (Am. Compl.

¶ 145(a)(x)); (2) it has "exclusive authority to determine that time, place, and manner" of

hunting and gathering under the Treaty (*id.* ¶¶ 94, 96), and (3) it has the right to hunt and

gather "up to and including one hundred percent (100 %) of any game, roots and berries,"

which it defines as "all life" within its territory, including not only the ceded area, but

also other unidentified lands "not within the ceded area" (*see id.* ¶¶ 100, 102-04,

145(a)(xi).  A judgment granting Skokomish Indian Tribe exclusive management

authority and the right to take up to one hundred percent of all game, roots and berries

would necessarily reduce or eliminate the rights that other signatory tribes currently enjoy

in the territory.

        In addition, any disposition of Skokomish Indian Tribe's claims without the other

signatory tribes would leave Defendants subject to a substantial likelihood of multiple

lawsuits rendering inconsistent results.  *See Makah Indian Tribe*, 910 F.2d at 558.

Because Jamestown S'Klallam, Lower Elwha Tribal Community, and Port Gamble

S'Klallam are signatories to the very treaty at issue in this action, "[t]he likelihood that

they would seek legal recourse in the event that the judgment deprived them of [treaty]

rights to which they believe they are entitled can hardly be characterized as speculative."

*See Keweenaw Bay*, 11 F.3d at 1347.  Based on the all of the foregoing, the court

concludes that the other signatories to the Treaty of Point No Point, including Jamestown

S'Klallam, Lower Elwha Tribal Community, and Port Gamble S'Klallam, are necessary

parties to this litigation.

        During oral argument, counsel for Skokomish Indian Tribe argued that the Ninth

Circuit's recent decision in *Alto*, 2013 WL 6813816, counseled a different result under

Rule 19 with respect to whether the absent signatory tribes are required parties. *Alto* involves very different facts from those before the court here. *Alto* is a tribal enrollment case. In *Alto*, a member of a tribe challenged the enrollment of descendants of an individual member who had been adopted and thus arguably did not have the requisite degree of Indian blood to be enrolled. *Id.* at *2. The tribe's enrollment committee voted to disenroll the adopted member's descendants, but this decision was ultimately reversed by the Bureau of Indian Affairs ("BIA") Assistant Secretary, who also issued an order disenrolling the adopted member's descendants. *Id.* The adopted member's descendants then brought suit against the Assistant Secretary and others to invalidate the disenrollment order, but did not name the tribe itself as a defendant. *Id.* The tribe moved to dismiss under Rule 12(b)(7) for inability to join a required party under Rule 19. *Id.* at *3. The district court declined to dismiss on this basis, and the tribe appealed. *Id.* at *3-5. The Ninth Circuit deviated from its "usual judicial 'hands off' policy for tribal membership decisions" because the tribe's constitution vested the Bureau of Indian Affairs ("BIA") with "ultimate authority over membership decisions." *Id.* at *1. The Ninth Circuit concluded that injury complained of was the BIA's failure to "carry[] out a responsibility delegated to it by the [tribe], under the [tribe's] own Constitution." *Id.* at *12. Thus, the injury "resulted from the Secretary's actions in ruling the [descendants at issue] ineligible for tribal membership, not from the [tribe's] prior actions with regard to the membership issue." *Id.* at *12. Accordingly, the Court concluded that complete relief could be afforded between the parties to the action and the tribe was not a required party. *Id.*

At oral argument, counsel for Skokomish Indian Tribe argued that, like *Alto*, this action involves an injury caused by the named governmental defendants only and not the absent tribes. Specifically, counsel asserted that it is the governmental defendants in this action who have misinterpreted the Treaty of Point No Point and threatened prosecutions on the basis of that misinterpretation, and that Skokomish Indian Tribe seeks only to enjoin the action of those defendants and not any actions by the other signatory tribes. Even if this assertion is true, it is inconsistent with the Amended Complaint that is on file in this action. Although it is true that the Amended Complaint does not expressly seek to enjoin any action by another signatory tribe, the requested relief, if granted, would without doubt affect the rights of other parties who are signatories of the Treaty.

As delineated in part above, the Amended Complaint is sweeping with respect to its requests for relief. It seeks a declaration of the meaning of a variety of terms relevant to the Privilege of hunting and gathering in Article 4 of the Treaty, including "hunting," "gathering," "roots," "berries," "open lands," and "unclaimed lands." (Am. Compl. ¶ 145(a)(ii)-(vii).) It seeks a declaration of "the scope of the Privilege of hunting and gathering roots and berries on open and unclaimed lands" under Article 4. (*Id.* ¶ 145(a)(viii).) It seeks a declaration of "the Territory" of the Tribe with respect to the Privilege under Article 4. (*Id.* ¶ 145(a)(ix).) It seeks a declaration of "the regulatory and management authority" of the Tribe with respect to the Privilege of hunting and gathering roots and berries under the Treaty, "including but not limited to the exclusive regulatory and management authority." (*Id.* ¶ 145(a)(x).) Finally, it seeks a declaration of "the

allocation of game, roots and berries to [the Tribe], as guaranteed by Article 4." (*Id.* ¶ 145(a)(xi).)

The court is hard pressed to understand how obtaining declarations regarding any of the foregoing, particularly with respect to the Tribe's exclusive regulatory authority under the Treaty or the allocation of resources under the Treaty, would not necessarily impact the rights of other signatory tribes under the Treaty. As a result, the court cannot conclude that *Alto* is controlling here or even particularly applicable. As discussed above, it is the Ninth Circuit's ruling in *Makah Indian Tribe* that provides the most analogous guidance here. *Makah Indian Tribe*, 910 F.2d at 559; *see also Keweenaw Bay*, 11 F.3d at 1346-47; *N. Arapaho Tribe*, 697 F.3d at 1279. Under that authority, the court must conclude that the other signatory tribes are required parties under Rule 19.

Because the court concludes that the other signatory tribes are required parties, it must turn to the remaining analytical steps of Rule 19. Under Rule 19(a), a required party will generally be joined as a party to the action. Fed. R. Civ. P. 19(a); *see Quileute Indian Tribe v. Babbit*, 18 F.3d 1456, 1459 (9th Cir. 1994). Indian tribes may not be joined, however, where they have not waived sovereign immunity. *Id.*; *Pit River Home & Agric. Co-op. Ass'n v. United States*, 30 F.3d 1088, 1100 (9th Cir. 1994) ("Federally recognized Indian tribes enjoy sovereign immunity from suit."); *Confederated Tribes*, 928 F.2d at 1499 ("Indian tribes ... are sovereign entities and are therefore immune from nonconsensual actions in state or federal court."). There has been no such waiver of sovereign immunity by the other tribes who are signatories of the Treaty of Point No Point. Indeed, Skokomish Indian Tribe admits that "[j]oinder is not . . . feasible as to any

other federally recognized Indian tribe, which possess[] sovereign immunity."  (Am. Compl. ¶ 139.)

Because the other signatory tribes cannot be joined due to their sovereign immunity, the court's next step is to determine whether in "equity and good conscience" the action should proceed in their absence.  Fed. R. Civ. P. 19(b).  Rule 19(b) provides that the factors to be considered in determining whether an action should be dismissed because a required party cannot be joined are:  "(1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by (A) protective provisions in the judgment, (B) shaping the relief, or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b); *see also Makah Indian Tribe*, 910 F.2d at 560.

The first factor in the Rule 19(b) analysis, prejudice to either existing or absent parties, is essentially the same as the legal interest test under Rule 19(a).  *See Quileute Indian Tribe v. Babbitt*, 18 F.3d 1456, 1460 (9th Cir. 1994); *Confederated Tribes*, 928 F.2d at 1499 (noting that prejudice test is essentially the same as legal interest test); *see also American Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1024-25 (9th Cir. 2002) ("Not surprisingly, the first factor of prejudice, insofar as it focuses on the absent party, largely duplicates the consideration that made a party necessary under Rule 19(a)."). Thus, for the reasons stated above with respect to the legal interest test, the court

1    concludes that the prejudice prong of Rule 19(b) weighs in favor of finding that the

2    action should be dismissed.

3         With respect to the second factor under Rule 19(b), it is not possible to lessen or

4    avoid prejudice to the other signatory tribes.  Skokomish Indian Tribe seeks adjudication

5    of the hunting and gathering rights under the Treaty.  Consequently, a judgment will

6    necessarily and unavoidably impact the other three signatory tribes.  If the court rules that

7    the Treaty does not extend to certain lands or resources, all signatory tribes would be

8    affected by that ruling.  Lands and resources either are subject to Treaty rights or they are

9    not.  The all-or-nothing nature of the absent tribes' interests favors dismissal.  If

10   Skokomish Indian Tribe were to succeed in obtaining a ruling that it has exclusive

11   authority to manage and harvest up to one hundred percent of the resources under the

12   hunting and gathering right contained in Article 4 of the Treaty, the absent tribes' rights

13   and interests would necessarily be reduced or eliminated.  There is no way to lessen this

14   prejudice absent joining these parties.[12]  Thus, the court concludes that this factor also

15   weighs in favor of dismissal.

16   _____

17        [12] During oral argument, counsel for Skokomish Indian Tribe asserted that the court could
     construe the Treaty of Point No Point in a manner unique to each individual signatory tribe and
18   that would be binding only with respect to that particular tribe because each tribe had a different
     understanding of the Treaty at the time of signing.  Counsel for Skokomish Indian Tribe
19   apparently took this novel position in an attempt to convince the court that any ruling in this case
     would not prejudice the absent tribes because it would not be applicable to them.  Counsel for the
20   Tribe is confusing Treaty interpretation with its application to historical facts.  For example,
     *Untied States v. Washington*, 730 F.2d 1314 (9th Cir. 1984), dealt specifically with where the
21   Makah Indian Tribe's "usual and accustomed fishing grounds and stations" were located under
     the 1855 Stevens Treaty.  *See United States v. State of Washington*, 969 F.2d 752, 755 n.2 (9th
22   Cir. 1992).  At the time that case arose, however, the treaty reference to "usual and accustomed
     grounds and stations" had already been interpreted.  *See id.* (citing *United States v. Lummi Indian*

The third factor—whether a judgment rendered in the non-party's absence would be adequate—also supports dismissal. The intent of the inquiry under this factor is not to examine the adequacy of the judgment from the point of view of the plaintiff but to determine whether a judgment would comport with "the interest of the courts and public in complete, consistent and efficient settlement of controversies." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111 (1968) ("We read the Rule's third criterion, whether the judgment issued in the absence of the nonjoined person will be 'adequate,' to refer to this public stake in settling disputes by wholes, whenever possible, for clearly the plaintiff, who himself chose both the forum and the parties defendant, will not be heard to complain about the sufficiency of the relief obtainable against them."). A judgment in the case would not be complete or efficient given the significant possibility

*Tribe*, 841 F.2d 317, 318 (9th Cir. 1988) ("In 1975 we affirmed . . . that Treaty tribes take up to 50 % of available harvest at the traditional grounds and stations. . . . Determination of usual and accustomed fishing grounds of the many tribes involved was left to subsequent proceedings.") (citing *United States v. Washington*, 384 F. Supp. 312, 332 (W.D. Wash. 1974), *aff'd* 520 F.2d 626, 683 (9th Cir. 1975) (commonly known as the Boldt decision))). Indeed, due to the similarity between the various Stevens Treaties, courts have repeatedly looked to prior decisions interpreting other Stevens Treaties for guidance. *See, e.g.*, *Nez Perce Tribe v. Idaho Power Co.*, 847 F. Supp. 791, 806 (D. Idaho 1994) ("Because of the similarity of these treaties, and almost identical language employed therein, the United States Supreme Court has, when interpreting one of these treaties, generally looked to cases construing other Stevens treaties for guidance. The Ninth Circuit has likewise considered other Stevens treaties when construing Indian rights under the various treaties."). Such an approach would be entirely inconsistent with the position advocated by counsel for Skokomish Indian Tribe. The Supreme Court has held that "treaties with the Indians must be interpreted as they would have understood them, and any doubtful expressions in them should be resolved in the Indians' favor." *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631 (1970) (internal citation omitted); *see also United States v. Washington*, 235 F.3d 438, 442 (9th Cir. 2000) (noting the "time-honored principle that ambiguities in agreements and treaties with Native Americans are to be resolved from the native standpoint . . . ."). This does not, however, mean that courts should interpret the Treaty of Point No Point in four different ways because there are four signatory tribes. If this were so, the end result would be four different judicially-construed treaties when in fact there is only one.

that Defendants would face subsequent litigation on the same issues with potentially

different results by the other signatory tribes, who likely would not be bound by any

result here. *See, e.g.*, *Northern Arapaho Tribe*, 697 F.3d at 1283 ("There would be

nothing 'complete, consistent, [or] efficient' about the settlement of this controversy if

the State of Wyoming were required to relitigate the issue with the [non-party tribe], with

potentially different results."). Thus, the court concludes that the third factor favors

dismissal.

The fourth and final factor—the existence of an adequate remedy if the action is

dismissed—weighs against dismissal. Skokomish Indian Tribe will not have an alternate

forum for its claims following dismissal. However, this factor is all but foreclosed as a

consideration when the absent party exercises sovereign immunity. The Ninth Circuit

has consistently held that a tribe's interest in sovereign immunity outweighs the lack of

an alternative forum. *United States v. Washington*, 573 F.3d 701, 708 (9th Cir. 2009)

(acknowledging that the tribe might not be able to sue another tribe seeking allocation of

a resource because the other tribe could invoke sovereign immunity, but pointing out that

"not all problems have judicial solutions"); *Dawavendewa*, 276 F.3d at 1162;

*Confederated Tribes*, 928 F.2d at 1500; *Makah Indian Tribe*, 910 F.2d at 560; *see*

*Wichita*, 788 F.2d at 777 n.13 (stating that when a necessary party is immune from suit,

"there is very little room for balancing of other factors."). Furthermore, there is no

reason that one sovereign should be given preference where other sovereigns share equal

interests in the case. Although this result may seem harsh, Skokomish Indian Tribe's

1  interests here do not trump the sovereign immunity of other signatory tribes to the Treaty

2  of Point No Point.[13]

3       In sum, Skokomish Indian Tribe seeks to litigate hunting and gathering rights

4  under the Treaty of Point No Point and asks this court to declare that it has exclusive

5  management authority over those Treaty rights and is entitled to an allocation of up to

6  one hundred percent of the relevant resources.  The prejudice that other signatory tribes

7  to the Treaty will suffer if a judgment is rendered in their absence cannot be alleviated or

8  avoided and any judgment would not render a complete resolution of the issues due to

9  potential future litigation by other affected parties.  Although Skokomish Indian Tribe

10 will likely not have an alternative forum following dismissal of this action, this factor

11 does not outweigh the others which favor dismissal particularly where the Tribe's

12 inability to obtain an alternative forum is due to the necessary parties' sovereign

13 immunity.  Accordingly, the court concludes that "in equity and conscience" this matter

14 should be dismissed without prejudice for failure to join indispensable parties.

15 **E.  Leave to Amend**

16      The court grants Skokomish Indian Tribe leave to amend its Amended Complaint.

17 Skokomish Indian Tribe filed its Amended Complaint in response to Defendants' first

18

19

20 [13] Based on *Automotive United Trades Organization v. State*, 285 P.3d 52 (Wash. 2012), Skokomish Indian Tribe urges the court to adopt "a broader interpretation of the indispensability rules as applied in the courts of the State of Washington."  (Resp. at 19.)  As the Tribe acknowledges, however, Washington courts are more permissive than the Ninth Circuit with respect to Rule 19(b) analysis.  *See id.* at 61-67 (Fairhurst, J., dissenting).  This court is obviously bound by federal and not state authority when it comes to the application of Rule 19 here.

motions to dismiss.  (*See* Dkt. ## 47, 48.)  Thus, it has already had one opportunity to

amend its original complaint in a manner that would avoid many of the issues discussed

above.  Nevertheless, the court recognizes that leave to amend a defective complaint

should be freely granted "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  During

oral argument, counsel for Skokomish Indian Tribe described a complaint that is

markedly different from the Amended Complaint on file and with claims more narrowly

drawn.  The court does not know if the drafting of such a complaint is possible or if it can

survive another motion to dismiss.  Nonetheless, based on counsel's statements during

oral argument, the court grants Skokomish Indian Tribe another opportunity to amend its

complaint herein.  Skokomish Indian Tribe may file another amended complaint that

avoids that grounds for dismissal discussed herein within twenty days of the date of this

order.  The court warns that failure to timely file an amended complaint will result in

dismissal of this action.

## IV. CONCLUSION

Based on the foregoing, the court GRANTS Defendants' motions to dismiss (Dkt.

## 59, 60) based on Skokomish Indian Tribe's failure to join the other signatory tribes to

the Treaty of Point No Point as requried parties to this action.  In addition, the court

GRANTS Defendants' motions to dismiss on grounds of Eleventh Amendment sovereign

immunity and failure to state a claim under Rule 12(b)(6) with respect to Defendants

Goldmark and Young only.  The court, however, GRANTS Skokomish Indian Tribe

leave to amend its Amended Complaint.  Skokomish Indian Tribe may file an amended

complaint within 20 days of the date of this order.  The court warns that failure to timely

file an amended complaint within 20 days of the date of this order will result in dismissal of this action without prejudice.

Dated this 13th day of January, 2014.

JAMES L. ROBART
United States District Judge